IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:08CR304 |
| Plaintiff | |
| v. | ORDER |
| Michael Dickerson, | |
| Defendant | |

This is a criminal case in which the defendant is charged along with several other defendants with participating in a drug conspiracy. He has filed a motion to suppress currency seized following two different traffic stops. [Doc. 148].

For the reasons that follow, the motion shall be denied.

**Background**

The first stop occurred near Omaha, Nebraska, on September 18, 2007. Douglas County Deputy Sheriff Edward Van Buren, a member of the drug interdiction unit, saw the defendant's vehicle on I-80 following another vehicle by about a car length. Following at that distance violates a provision of Nebraska law prohibiting following another vehicle at an unsafe distance. The defendant's vehicle slowed to forty-five or fifty mph; the Deputy pulled over to let it pass. He

1

considered the defendant's actions to be suspicious. Deputy Van Buren also saw the defendant's vehicle on the pavement demarcating the lanes; this also violated Nebraska highway laws.

The Deputy stopped the defendant's vehicle on the basis of these traffic violations. He told the defendant to get out of the car; the defendant did so. When asked about the purpose and destination of the trip, the passenger, who was very nervous, said they were transporting the vehicle, but he didn't say where or to whom.

The defendant said that he was driving the vehicle to Los Angeles to someone who had bought it on eBay. He did not, however, have the paperwork that is customary when someone is transporting a vehicle for another person. Running the license plate, Deputy Van Buren confirmed that the vehicle was titled in the name of a third party.

About five minutes after the stop, Deputy Van Buren notified another member of the interdiction unit, Deputy Jason Bargstadt. Deputy Bargstadt is a canine officer; he arrived on the scene with his drug detection dog "Voss" within about five minutes of Deputy Van Buren's call.

Deputy Van Buren also checked the defendant's name with the El Paso Intelligence Center [EPIC]. He learned that the defendant was the subject of an active investigation for suspected drug distribution.

When asked for consent to search the car, the defendant said it was not his. Deputy Bargstadt walked his dog around the vehicle. The dog gave an "indication" on the rear hatchback door of the vehicle.

During this litigation, Officers Van Buren and Bargstadt have been questioned extensively about the dog's training, their own experience and the significance of an "indication." An indication

does not necessarily mean that drugs are present; it shows, simply, that the dog has detected the odor of a controlled substance.

Thereon, the officers conducted a search of the vehicle. Deputy Fitzsimmons, another member of the interdiction team who had arrived on the scene, removed the right rear quarter panel and found a heat sealed container with $30,800 in currency.

The search uncovered no drugs. After seizing and retaining the currency, the officers allowed the defendant and his passenger to continue on their way.

The second stop occurred near St. Louis in Phelps County, Missouri on November 26, 2007. Detective Jerome Paszkitwicz of the St. Louis County Police Department's Drug Enforcement Unit had checked the registrations at Super 8 Motel within his jurisdiction. This was one of six motels whose registrations he checked on a regular basis.

Detective Paszkitwicz learned that the defendant had registered late at night, paid cash and was driving a rental car. Though these would seem to be fairly commonplace circumstances, Detective Paszkitwicz considered them sufficiently suspicious to check the defendant's name in EPIC.

In doing so, he learned that Special Agent Kyle Fullmer of the Toledo, Ohio, F.B.I. office was investigating the defendant. When Detective Paszkitwicz told him that he "had" the defendant in a motel near St. Louis, Special Agent Fullmer expressed surprise, as a GPS unit attached under the rear bumper of the defendant's vehicle showed that he was still in Toledo.

Special Agent Fullmer told Detective Paszkitwicz that a reliable, confidential informant had told him that the defendant had between $100,000 and $200,000 in currency. Detective Paszkitwicz also learned that the defendant had complained about another St. Louis Police Department officer

3

who had seized and kept $100,000 following an earlier stop. Detective Paszkitwicz had heard rumors about that incident and officer, who had since resigned from the Department.

When the defendant and a juvenile companion left the motel around 9:20 a.m., Detective Paszkitwicz notified Phelps County Sheriff Donald Blankenship, seeking his assistance in making a possible traffic stop. Shortly thereafter, Sheriff Blankenship saw the defendant's car driving westbound on I-44. Following the defendant, the Sheriff saw him speeding at 76 mph in a 70 mph zone as he passed a truck. [1]

Sheriff Blankenship stopped the defendant's car. He went to the passenger side of the vehicle, where the juvenile, who turned out to be the defendant's son, was sitting, and told the defendant to go to the rear of the vehicle. The defendant did so. When asked about the reason for the trip, the defendant first said that it was to see one of his son's friends; he then said it was to bring a friend of his son's back to Ohio.

The Sheriff told the defendant that they knew he had been involved in a prior seizure of money in Nebraska in September. He asked the defendant if he was carrying drugs, guns or money. The Sheriff asked if he could search the car; the defendant indicated that he could. [2]

---

[1] Sheriff Blankenship and Detective Paszkitwicz, who was following the Sheriff as he followed the defendant, both testified that they "paced" the defendant's car at 76 mph. I find that it is more likely than not that the defendant reached that speed while passing the truck.

[2] Neither Sheriff Blankenship nor Detective Paszkitwicz could remember the exact words which the Sheriff used to communicate his request for permission to search. I find that it is more likely than not the he did, in fact, ask for permission in some manner or another, and the defendant responded affirmatively. This was the third time the defendant had been stopped while conveying money; it's fair to conclude that he knew what was going on, and what was likely to happen – namely, that money might be found and seized, and he'd be sent on his way.

Following a cursory search of the trunk, interior and under the hood, the Sheriff told the defendant that he wanted him to drive the car to the police department. The defendant, accompanied by Detective Paszkitwicz, did so. There he and his son were placed in interrogation rooms while the officers continued their search.

Detective Paszkitwicz first looked under the bumper for the GPS unit. He did not find the device, but he saw that foam behind the bumper had been displaced. Looking further, he saw packages of currency totaling about $100,000 behind the bumper. He seized the money. The defendant told the officers that it was not his money.

## Discussion

The defendant claims that the officers searched the vehicles without lawful justification or authority. The government contends that both stops and the ensuing detentions and searches were lawful. I agree.

### 1. Nebraska Stop & Search

As a general rule, a traffic stop is lawful where the officers have probable cause to believe that a driver has violated a traffic law. *See*, *e.g.*, *U.S. v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2006). The fact that the stop – provided it was based on a traffic violation – was a pretext for further investigation is not a basis for finding the stop unlawful. *See*, *e.g.*, *Whren v. U.S.*, 517 U.S. 806, 813, 116 S.Ct. 1769 (1996) ("Constitutional reasonableness of traffic stops [does not] depend []on the actual motivations of the individual officers involved . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Gaddis v. Redford Twp.*, 364 F.3d 763, 770 (6th Cir. 2004) ("police may make a stop when they have probable cause to believe a civil traffic violation has occurred, even if the defendant raises a claim that the stop was pretextual.").

I credit the testimony that the initial stop was based on observation of traffic violations. The stop was, accordingly, lawful. [3]

The defendant does not have standing to challenge the subsequent search of the vehicle. He has not shown a possessory interest in the vehicle. Indeed, he disclaimed any such interest on being stopped and later, on being asked for consent.

Standing to challenge a search of a vehicle requires a showing of a possessory interest – such as ownership. *Cash v. Williams*, 455 F.2d 1227, 1229 (6th Cir. 1972) ("In order to establish standing to contest a search, a defendant must show that he owned or possessed the seized property or that he had a possessory interest in or was present at the premises searched.").

Simply being a driver of someone else's car does not give rise to standing. *U.S. v. Taylor*, 496 F.Supp.2d 852, 855-56 (S.D.Ohio 2006) ("Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest.").

At a minimum, the defendant "bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession." *Id*. (internal citations omitted). He has not done so.

Because the defendant does not having standing, it is not necessary to consider the merits of his contention that the search violated the Fourth Amendment.

---

[3]

The Sixth Circuit has held that observation of a vehicle following too closely to another vehicle provides grounds for a lawful traffic stop. *U.S. v. Valdez*, 147 Fed.Apx. 591, 595 (6th Cir. 2005) (Unpublished disposition) (following another vehicle within twenty to thirty feet); *see also Sanford, supra*, 476 F.3d at 396 (ten feet). In addition, the deputy in this case saw two separate additional violations before stopping the defendant's car.

## 2. Missouri Stop & Search

There was nothing unconstitutional about stopping the defendant once the officer saw him exceeding the speed limit.

I find that thereafter the defendant consented to the search that uncovered the cash seized by the officers, and which the defendant seeks to suppress. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[T]he Fourth Amendment prohibits searches without a warrant except when the search is conducted with consent or under certain exigent circumstances.").

The period of detention between the initial stop, discovery of the cash and release of the defendant was not unreasonable. He had consented to a search of his vehicle while still on the highway. His actions in driving to the Sheriff's Department, though a deputy was with him, did not affect the quality or significance of his consent. I find it more likely than not that he, like the officers, believed that the next steps, whatever they might be, would be conducted more safely for all concerned if done away from the highway.

Once at the station, the defendant renewed his consent.

I do not find the circumstances to have caused his consents to have resulted from coercion, his will being overborne or otherwise involuntary.

There was nothing improper, much less unlawful, that occurred during the encounter in Missouri.

## Conclusion

For the foregoing reasons, it is

ORDERED THAT the defendant's motion to suppress [Doc. 148] be, and the same hereby is overruled.

So ordered.

                                                                          s/James G. Carr
                                                                          James G. Carr
                                                                          Chief Judge